# EXHIBIT A

2120 - Served
2220 - Not Served
2320 - Served By Mail
2420 - Served By Publication
Summons - Alias Summons

.2121 - Served
2221 - Not Served
2321 - Served By Mail
2421 - Served By Publication

(06/28/18) CCG 0001

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

NEIL GRAVES, Individually, et al.,

(Name all parties)

v.

STERIGENICS U.S., LLC, et al.,

Case No. 2018 L ___ 2018L010510

Please serve: See Attached

### ☑ SUMMONS   ☐ ALIAS SUMMONS

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee within thirty (30) days after service of this Summons, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit https://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp.

Witness: _____

9/27/2018 1:26 PM DOROTHY BROWN

Atty. No.: 31444

Atty Name: Todd A. Smith and Brian LaCien

Atty. for: Plaintiff

Address: 70 W. Madison Street, 55th Floor

City: Chicago          State: IL

Zip: 60602

Telephone: 312-236-9381

Primary Email: blacien@prslaw.com

Secondary Email: tmoran@prslaw.com

Tertiary Email: _____

DOROTHY BROWN, Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with Defendant or other person):

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois   cookcountyclerkofcourt.org**

# CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

- ● Richard J Daley Center
  50 W Washington
  Chicago, IL 60602

- ○ District 2 - Skokie
  5600 Old Orchard Rd
  Skokie, IL 60077

- ○ District 3 - Rolling Meadows
  2121 Euclid
  Rolling Meadows, IL 60008

- ○ District 4 - Maywood
  1500 Maybrook Ave
  Maywood, IL 60153

- ○ District 5 - Bridgeview
  10220 S 76th Ave
  Bridgeview, IL 60455

- ○ District 6 - Markham
  16501 S Kedzie Pkwy
  Markham, IL 60428

- ○ Domestic Violence Court
  555 W Harrison
  Chicago, IL 60607

- ○ Juvenile Center Building
  2245 W Ogden Ave, Rm 13
  Chicago, IL 60602

- ○ Criminal Court Building
  2650 S California Ave, Rm 526
  Chicago, IL 60608

## Daley Center Divisions/Departments

- ○ Civil Division
  Richard J Daley Center
  50 W Washington, Rm 601
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Chancery Division
  Richard J Daley Center
  50 W Washington, Rm 802
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Domestic Relations Division
  Richard J Daley Center
  50 W Washington, Rm 802
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Civil Appeals
  Richard J Daley Center
  50 W Washington, Rm 801
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Criminal Department
  Richard J Daley Center
  50 W Washington, Rm 1006
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ County Division
  Richard J Daley Center
  50 W Washington, Rm 1202
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Probate Division
  Richard J Daley Center
  50 W Washington, Rm 1202
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Law Division
  Richard J Daley Center
  50 W Washington, Rm 801
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Traffic Division
  Richard J Daley Center
  50 W Washington, Lower Level
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

Graves, et al., v. Sterigenics U.S., LLC, et al.
Court No. 2018 L

Please serve:

Sterigenics U.S., LLC
2015 Spring Road, Suite 650
Oak Brook, Illinois

GTCR LLC
300 N. LaSalle Street, Suite 5600
Chicago, Illinois

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

FILED
9/27/2018 1:26 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

NEIL GRAVES, Individually and On Behalf of All Those
Similarly Situated; and
MARJORIE GRAVES, Individually and On Behalf of All
Those Similarly Situated,

        Plaintiffs,

v.

STERIGENICS U.S. LLC and
GTCR LLC.

        Defendants.

2018L010510
No.

## CLASS ACTION COMPLAINT

Plaintiffs NEIL GRAVES, individually and on behalf of all those similarly situated, and

MARJORIE GRAVES, individually and on behalf of all those similarly situated, by and through

their attorneys, POWER ROGERS & SMITH, LLP and KOREIN TILLERY LLC, state as follows

for their class action complaint against Defendants STERIGENICS U.S. LLC ("Sterigenics") and

GTCR LLC ("GTCR"):

### NATURE OF THE ACTION

1.        This cause of action arises out of Sterigenics' decades long emissions of ethylene

oxide ("EtO") from its facility in Willowbrook, Illinois. The Sterigenics plant is used to sterilize

medical devices, pharmaceuticals, and food products by placing them into sealed chambers,

which are then sprayed with EtO, a powerful sterilizing agent. EtO is a highly flammable,

colorless gas and has been a known human carcinogen for decades.

FILED DATE: 9/27/2018 1:26 PM   2018L010510

2.        Since 1984, Sterigenics has willfully and negligently released hazardous levels of
EtO from its Willowbrook facility into the air, where it has drifted into homes, workplaces, and
schools.

3.        Both the Environmental Protection Agency (EPA) and the World Health
Organization (WHO) classify EtO as a "'carcinogenic to humans' by the inhalation route of
exposure" and find sufficient evidence to establish a causal relationship between EtO exposure
and breast, lymphatic, and hematopoietic cancers in humans.[1]

4.        On August 21, 2018, the U.S. Department of Health and Human Services' (HHS)
Agency for Toxic Substances and Disease Registry (ATSDR) publicly released an "Evaluation
of Potential Impacts for Ethylene Oxide Emissions" analyzing whether the emissions of the
Sterigenics Willowbrook facility "pose a public health problem." (See U.S. H.H.S.' "Evaluation
of Potential Health Impacts from Ethylene Oxide Emissions," attached as Exhibit A).

5.        The ATSDR's evaluation found that Sterigenics' EtO emissions were not merely a
public health problem, **they posed a high enough cancer risk to qualify as a "public health
hazard."** (Ex. A, pg. 2). The ATSDR arrived at this conclusion based on air sampling it
conducted in areas immediately surrounding the Willowbrook Sterigenics facility to estimate
current EtO exposures. As a result of this finding, the ATSDR urged that "Sterigenics take
immediate action to reduce EtO emissions at this facility" (Ex. A, pg. 12).

6.        Sterigenics' EtO emissions have exposed Plaintiffs to unacceptable levels of cancer
risk. The EPA generally considers the maximum "acceptable risk" for air toxics to be roughly
100 per million (i.e., for every one million people exposed, 100 will develop cancer over their

---

[1] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/subst/1025_summary.pdf &
https://monographs.iarc.fr/wp-content/uploads/2018/06/mono100F-28.pdf *(both accessed 9.25.2018)*.

FILED DATE: 9/27/2018 1:26 PM    2018L010510

lifetimes).[2]  However, the 2014 EPA National Air Toxics Assessment (NATA) released on August 22, 2018 found the lifetime cancer risk in the tract of land upon which the Sterigenics facility sits (Tract ID # 17043845902) to be 281.8075 per million, almost three times the maximum acceptable level.

7.        But the August 21, 2018 ATSDR report found that even these concerning estimates of cancer risk were too low. The ATSDR used its 2018 air sampling to calculate that Sterigenics' EtO emissions caused "an additional lifetime risk of 6.4 cancers in a population of 1,000 residents who could be exposed to EtO emissions from Sterigenics." (Ex. A., pg. 10). This is equivalent to 6,400 per million, placing the Willowbrook area's cancer risk at **64 times the EPA's maximum acceptable risk level.**

8.        Moreover, historical EPA emission reports from the Willowbrook Sterigenics facility demonstrate that the amounts of EtO released from the plant over the last decade are significantly lower than the amounts released during prior decades. Total air releases in the 1990s were up to **7.7 times higher** than present levels. Sterigenics' EtO releases in the 1980s were even higher than this, with available data suggesting that Sterigenics released **over 20 times more** EtO into the air in 1988 than it did in 2016, the most recent date for which emissions data is publicly available. As a result, the ATSDR report's current estimate of Willowbrook area residents' cancer risk (which is based on sampling conducted this year) must drastically underestimate of the levels of risk faced by those exposed to the Sterigenics facility's emissions in the 1980s and 1990s.

9.        Prior to the ATSDR evaluation's release on August 21, 2018 and the 2014 NATA release on August 22, 2018, the risks and impacts associated Sterigenics' EtO emissions were

---

[2] https://www.epa.gov/national-air-toxics-assessment/nata-frequent-questions *accessed 9.25.2018.*

FILED DATE: 9/27/2018 1:26 PM    2018L010510

not generally known to the public. As a result, Willowbrook area residents and workers were not apprised of the unique dangers Sterigenics had exposed them to until this time.

10.     Willowbrook is a southwestern suburb of the city of Chicago with approximately 8,500 residents. The area where the Sterigenics facility is located is in a densely populated metropolitan area, with 19,271 people living within one mile of the facility boundary and tens of thousands more living within a six mile radius. In addition, there are four schools and one daycare facility within a one-mile radius. (U.S. Census, 2016). (Ex. A, pg. 3).

## PARTIES

11.     On and before August 21, 2018, and at all times material, Plaintiff NEIL GRAVES, resided and owned property at 233 Summerset Road, Willowbrook, Illinois consistently from 1987 until 2000, and has resided and owned property at 512 Ridgemoore Drive, Willowbrook, Illinois from 2000 until the present day.

12.     On and before August 21, 2018, and at all times material, Plaintiff MARJORIE GRAVES resided and owned property at 233 Summerset Road, Willowbrook, Illinois consistently from 1987 until 2000, and has resided and owned property at 512 Ridgemoore Drive, Willowbrook, Illinois from 2000 until the present day.

13.     Sterigenics US LLC is a business specializing in sterilizing medical devices, pharmaceuticals, food and high-performance materials with a headquarters and principal place of business at 2015 Spring Road, Suite 650, Oak Brook, Illinois.

14.     Sterigenics operates two facilities in Willowbrook, Illinois, one at 7775 S. Quincy St. and one at 830 Midway Drive.

15.     GTCR LLC has been an owner of Sterigenics since 2011. GTCR's principal place of business is at 300 N. LaSalle Street, Suite 5600, Chicago, Illinois.

4

## JURISDICTION AND VENUE

16.      This Court has jurisdiction over all Defendants because they are domiciled with their principal place of business in Illinois, and do regular and continuous business in Cook County, Illinois.

17.      Plaintiffs currently reside in Illinois.

18.      Venue is proper pursuant to 735 ILCS 5/2-101 because Sterigenics' principal place of business is at 2015 Spring Road, Suite 650, Oak Brook, Illinois.

19.      This Court retains jurisdiction pursuant to the local controversy exception to the Class Action Fairness Act (CAFA), 28 U.S.C § 1332(d)(4)(A)(i)(I-III) because: i) more than two-thirds of the proposed class members in the aggregate are citizens of the State of Illinois; ii) Sterigenics is the defendant the proposed class members are seeking significant relief from, whose conduct forms a significant basis for the claims asserted by Plaintiffs, and is a citizen of the State of Illinois; and iii) Plaintiffs' principal injuries resulting from Sterigenics' conduct were incurred in the State of Illinois. The purpose of the local controversy exception to CAFA is to allow state courts to retain cases when the controversy is so strongly linked to that state, much like the present case.

## CLASS ACTION ALLEGATIONS

20.      Plaintiffs bring this class action complaint pursuant to 735 ILCS 5/2-801:

**a. Numerosity**

This class is so numerous that joinder of all members would be impracticable. Over 19,000 people live within or have lived within a one to six mile radius of the Willowbrook facility from 1984 to the present. Therefore, this class could contain

FILED DATE: 9/27/2018 1:26 PM  2018L010510

thousands of members. Class certification would be substantially more practical than joinder.

**b. Commonality**

Common questions of law and fact exist as to all members of the class, including but not limited to:

a. Whether Defendants fraudulently concealed the highly carcinogenetic nature of EtO from the Plaintiffs;

b. Whether Defendants could have upgraded their facility to reduce EtO emissions;

c. Whether Defendants acted unreasonably in refusing to upgrade their facility to reduce EtO emissions;

d. Whether Defendants acted unreasonably in failing to warn class members that its facility emits EtO into the air;

e. Whether EtO emissions from Defendants' facility interfered with class members' right to breathe clean air without dangerous of EtO;

f. Whether Defendants caused Plaintiffs' property values to diminish;

g. Whether Defendants interfered with the use and enjoyment of Plaintiffs' properties;

h. Whether Defendants trespassed on Plaintiffs' properties by emitting EtO for decades.

Common questions of law and fact predominate over any questions pertaining to individual members.

6

FILED DATE: 9/27/2018 1:26 PM    2018L010510

### c. Adequacy

The representative Plaintiffs will fairly and adequately protect the interests of the entire class. Plaintiffs have no adverse interest to any members of the class. Plaintiffs' intent is to prosecute this case on behalf of all class members, not just themselves. Further, Plaintiffs are relying upon counsel that have knowledge and experience in handling class action lawsuits.

### d. Appropriateness and Efficiency

This class action is an appropriate method for the fair and efficient adjudication of the controversy because it concerns potentially thousands of plaintiffs all complaining of Defendant's wrongful conduct. A class action is therefore the most efficient and effective method for adjudicating this matter.

21.    Plaintiffs bring this action on behalf of themselves and all current Illinois residents similarly situated who purchased property or resided within 6 miles of the Sterigenics facility at 7775 Quincy St., Willowbrook, State of Illinois, from 1984 to the date of this complaint for losses and damages, stemming from the use and release of ethylene oxide, including but not limited to loss of value and infringement on personal and real property, statutory penalties, and injunctive relief/equitable relief. Excluded from the class are Defendants and their affiliates, predecessors, successors, officers, directors, agents, servants, employees, and the immediate family members of such persons. Plaintiffs reserve the right to modify the class definition or propose subclasses if discovery reveals that such modifications are appropriate.

## FACTUAL ALLEGATIONS

7

FILED DATE: 9/27/2018 1:26 PM 2018L010510

## A. Ethylene Oxide Exposure Carries a High Risk of Cancer in Humans

22.        The causal link between EtO and human cancer has been documented for decades. EtO is well-known mutagen – the EPA reports that the "DNA-damaging properties of EtO have been studied since the 1940s."[3] Meanwhile, U.S. sterilizer companies became broadly aware of EtO's potential carcinogenic effects in 1977, with most sterilizing companies taking steps to lower worker exposure though better venting in 1978.[4]

23.        Numerous studies have been published demonstrating that EtO causes lymphatic, hematopoietic, brain, lung, connective tissue, uterus, and mammary gland cancers in mice and rats.[5]

24.        The National Institute of Occupational Safety and Health (NIOSH) first raised awareness of the dangers of EtO in a 1977 bulletin aimed at facilities using EtO as a sterilant.[6] NIOSH recommended "that ETO be considered as mutagenic and potentially carcinogenic to humans and that occupational exposure to it be minimized," with alternate sterilization procedures used wherever feasible.[7]

25.        In 1981, NIOSH released a follow-up bulletin titled "Ethylene Oxide (EtO): Evidence of Carcinogenicity," recommending that workplaces regard EtO as "a potential occupational carcinogen" based on the results of an industry-sponsored study.[8]

---

[3] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/subst/1025_summary.pdf *accessed 9.25.2018.*
[4] Kyle Steenland, et al., "Mortality among workers exposed to ethylene oxide," *The New England Journal of Medicine* 324, no. 20 (1991): 1403.
[5] Kyle Steenland, et al., "Mortality among workers exposed to ethylene oxide," *The New England Journal of Medicine* 324, no. 20 (1991): 1403.
[6] https://www.cdc.gov/niosh/docs/77-200/ *accessed 9.25.2018.*
[7] https://www.cdc.gov/niosh/pdfs/77-200a.pdf?id=10.26616/NIOSHPUB77200 *accessed 9.25.2018.*
[8] https://www.cdc.gov/niosh/docs/81-130/ *accessed 9.25.2018.*

FILED DATE: 9/27/2018 1:26 PM    2018L010510

26.     In 1985, the U.S. HHS National Toxicology Program classified EtO as "reasonably anticipated to be a human carcinogen."[9]

27.     In 1987, the state of California (home to two Sterigenics EtO sterilizing plants)[10] officially designated EtO a carcinogen.[11]

28.     In the early 1990s, the first high quality, long-term research on ethylene oxide's carcinogenic impacts on humans was published. This research was undertaken based on a NIOSH study tracking the mortality of 18,254 U.S. workers who had been exposed to EtO between the 1940s and 1980s at sterilizer plants much like the Sterigenics Willowbrook facility. In fact, according to a Sterigenics employee, the NIOSH study actually included "a couple" of Sterigenics facilities.[12] The NIOSH study ultimately found causal links between exposure to EtO and increased mortality from lymphatic, hematopoietic, and breast cancers. The research on the NIOSH study has since been heavily cited and relied upon by major regulatory organizations, including the WHO and EPA.

29.     The first publication based on this cohort came out in May 1991, finding a "slight but significant increase among men" for hematopoietic cancer with risk of death increasing over time since first exposure to EtO (the study also noted that men were more likely to be exposed to higher amounts of EtO).[13]

[9] https://ntp.niehs.nih.gov/ntp/roc/content/profiles/ethyleneoxide.pdf *accessed 9.25.2018.*
[10] https://web.archive.org/web/20180210142202/https://www.sterigenics.com/About_Us/Facilities.php *accessed 9.25.2018.*
[11] http://articles.latimes.com/1991-03-05/local/me-66_1_toxic-gas *accessed 9.25.2018.*
[12] https://yosemite.epa.gov/Sab/Sabproduct.nsf/B839FA45582C200185257D9500496B0E/$File/EPA-+Sterigenics+Speaking+Points+for+IRIS+SAB+Review-Nov+2014.pdf *accessed 9.25.2018.*
[13] Kyle Steenland, et al., "Mortality among workers exposed to ethylene oxide," *The New England Journal of Medicine* 324, no. 20 (1991): 1402.

FILED DATE: 9/27/2018 1:26 PM    2018L010510

30.     In 1994, based in part on this research, the WHO's International Agency for Research on Cancer (IARC) listed EtO as a Group 1 human carcinogen, the agency's highest risk classification[14]

31.     The U.S. HHS National Toxicology Program in turn reclassified EtO as "known to be a human carcinogen" in 2000, updating its previous designation as "reasonably anticipated to be a human carcinogen" from 1985.[15]

32.     The U.S. Department of Labor's Occupational Safety and Health Administration (OSHA) 2002 fact sheet on EtO indicates that "[b]oth human and animal studies show that EtO is a carcinogen" and requires employers to provide clear signs and labels notifying workers of EtO's "carcinogenic and reproductive hazards."[16]

33.     Follow-up research on the NIOSH cohort was published in 2003 and found that EtO was associated with breast cancer in women, with a positive trend of increased cancer risk with increased EtO exposure.[17]

34.     Additional NIOSH cohort research came out the following year (2004), finding increased incidence of hematopoietic cancer with greater EtO exposure among men, particularly in the case of lymphoid tumors. The study also found "a significant excess of bone cancer compared to the US population," a finding supported by some animal studies, but drew no conclusions from this finding due to this finding being based on a small number of deaths.[18]

---

[14] World Health Organization, "Ethylene Oxide" (2003): 35. *Accessed at* http://www.who.int/ipcs/publications/cicad/en/cicad54.pdf *on 9.25.2018.*
[15] https://ntp.niehs.nih.gov/ntp/roc/content/profiles/ethyleneoxide.pdf *accessed 9.25.2018.*
[16] https://www.osha.gov/OshDoc/data_General_Facts/ethylene-oxide-factsheet.pdf *accessed 9.25.2018.*
[17] Kyle Steenland, et al., "Ethylene oxide and breast cancer incidence in a cohort study of 7576 women (United States)," *Cancer Causes and Control* 14, no. 6 (2003): 531.
[18] Kyle Steenland, et al., "Mortality analyses in a cohort of 18 235 ethylene oxide exposed workers: follow up extended from 1987 to 1998," *Occupational & Environmental Medicine* 61, no. 1 (2004): 6-7.

FILED DATE: 9/27/2018 1:26 PM 2018L010510

35.     Subject to extensive lobbying from sterilization companies, the EPA continued to define EtO as "probably carcinogenic to humans" until 2016. Sterigenics took part in these efforts, submitting comments in 2014 seeking to influence the EPA's draft Integrated Risk Information System (IRIS) reassessment of EtO's risks. In a November 12, 2014 letter, Sterigenics' Senior Vice President of Global Environmental, Health & Safety, Kathleen Hoffman, expressed "significant concerns regarding the [EPA's] cancer risk estimates for E[t]O" and argued that "the current assessment [which raised the risks associated with EtO] results in the risk of E[t]O being inappropriately magnified."[19] According to Hoffman, an IRIS assessment closely linking ethylene oxide to cancer risks was problematic because it could "lead to the further regulation of E[t]O exposure." As a result, Hoffman argued that the EPA should not rely too heavily on the NIOSH cohort study that made these causal linkages, even though these conclusions were based in part on the health outcomes of former Sterigenics employees.

36.     Kathleen Hoffman is also the President of the Ethylene Oxide Sterilization Association, another group that has lobbied to EPA to maintain lower ethylene oxide cancer risk estimates.[20]

37.     The EPA ultimately rejected industry arguments against increasing the cancer risk associated with EtO. The final IRIS assessment released in 2016 reclassified EtO as "carcinogenic to humans,"[21] representing a "30-fold increase in cancer potency" (Ex. A, pg. 1). This finding brought the EPA assessment in line with other federal agencies' findings.

---

[19]

https://yosemite.epa.gov/sab/sabproduct.nsf/BC3AE563588248BC85257D8E00785A32/$File/sterigenics+comments.pdf *accessed 9.25.2018.*

[20] https://www.sterigenics.com/services/steripro_consulting/specialization/CV_-_Environmental_Safety.pdf *accessed 9.25.2018.*

[21] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/subst/1025_summary.pdf *accessed 9.25.2018.*

FILED DATE: 9/27/2018 1:26 PM 2018L010510

38.     Based on the foregoing, Sterigenics knew or should have known about the human cancer risks associated with EtO when it first began operating its Willowbrook facility in 1984. Sterigenics took part in and was familiar with the results of the NIOSH cohort study. Moreover, Sterigenics was exposed to NIOSH and OSHA industry guidance on occupational EtO risks as well as regulatory classifications of EtO as a human carcinogen. The company was well aware of existing research and regulation demonstrating that EtO could cause cancer in those who breathed it in.

39.     Yet, as will be detailed below, while Sterigenics took steps to protect its workers by venting EtO from its Willowbrook facility, in so doing it recklessly and negligently released EtO into the air breathed by Plaintiffs. Sterigenics failed to take reasonable steps to limit emissions from its Willowbrook plant, exposing those working, residing, and studying nearby to dramatically increased cancer risks.

**B. Sterigenics Has Been Emitting Ethylene Oxide for Decades**

40.     Sterigenics has operated, maintained, and used its Willowbrook sterilizing facility at 7775 Quincy Street since 1984. The Willowbrook facility consists of two buildings, Building 1 and Building 2, with fifteen and four sterilization chambers respectively. Building 1's chambers were built in 1984 and Building 2's chambers were built in 1999 and 2012 (Ex. A, pg. 2).

41.     Each chamber stores various medical devices, pharmaceuticals, and food products contained on 40" x 48" pallets, which are then sprayed with EtO and other chemical compounds, such as gamma, Ebeam, and x-ray sterilization. (Ex. A, pg. 2). Figure 1, below, roughly illustrates an EtO sterilization process:

12

**Figure 1: Ethylene Oxide Sterilization Process[22]**



42.     From 1984 to present, the back vents on the Willowbrook plant's sterilization chambers were uncontrolled, allowing uninhibited passive release of EtO into the surrounding environment.

43.     This situation persisted in spite of Sterigenics Vice President of Global Environmental, Health & Safety Kathleen Hoffman's 2014 assertion to the EPA that the EtO sterilizing industry "has utilized emission controls to significantly reduce environmental E[t]O emissions during the past several years."[23] Kathleen Hoffman made this statement in order to convince the EPA there was no reason to raise the cancer risk EtO posed to the public, even as her own company had not implemented such emission controls at its Willowbrook facility and was exposing the public to elevated cancer risks.

44.     Only now, after the ATSDR's recent investigation finding hazardous levels of EtO around its plant, has Sterigenics reportedly begun to install pollution controls to limit passive EtO release (Ex. A, pg. 2).

---

[22] https://www.csb.gov/assets/1/20/sterigenics_report.pdf?13828
[23]
https://yosemite.epa.gov/sab/sabproduct.nsf/BC3AE563588248BC85257D8E00785A32/$File/sterigenics+comment s.pdf *accessed 9.25.2018.*

13

45.     Therefore, Sterigenics has been passively emitting EtO from its Willowbrook facility into the surrounding community for the past 34 years (Ex. A, pg. 2).

46.     Emissions data from the United States Environmental Protection Agency's Toxic Release Inventory (TRI) show large amounts of EtO emissions in the late-1990s (see Figure 3 and Figure 4, below).

47.     No continuous data exist before 1995 on ambient air releases. However, the ATSDR notes that the available data suggest that "substantially higher ambient releases prior to 1995 were likely." (Ex. A, pg. 2). Indeed, a lone 1988 report on Sterigenics' Willowbrook facility's EtO emissions accessed through the EPA's TRI Explorer Database supports this contention.[24] The 1988 report indicates that the Willowbrook facility emitted 97,518 pounds of EtO into the air.[25] This is over three times greater than the highest amount recorded in the contiguous 1995-2016 data set (32,200 pounds in 1998) and over 20 times greater than emissions levels in 2016 (4,205 pounds).

48.     Figure 2 and Figure 3 illustrate available data on the total EtO air emissions released from the Willowbrook Sterigenics Facility:

---

[24]

https://iaspub.epa.gov/triexplorer/release_trends?tri=60521GRFFT7775Q&p_view=TRYR&trilib=TRIQ1&sort=_V IEW_&sort_fmt=1&state=All+states&county=All+counties&chemical=000075218&industry=ALL&core_year=&t ab_rpt=1&FLD=AIRLBY&FLD=E1&FLD=E2&FLD=E3&FLD=E4&FLD=E41&FLD=E42&FLD=E5&FLD=E5 2&FLD=E53&FLD=E53A&FLD=E53B&FLD=E54&FLD=E51&FLD=E51A&FLD=E51B&FLD=TSFDSP&FLD =m10&FLD=m41&FLD=m62&FLD=potwmetl&FLD=m71&FLD=m81&FLD=m82&FLD=m72&FLD=m63&FL D=m64&FLD=m65&FLD=m66&FLD=m67&FLD=m73&FLD=m79&FLD=m90&FLD=m94&FLD=m99&FLD= RELLBY

[25]

https://ofmpub.epa.gov/enviro/tri_formr_partone_v2.get_thisone?rpt_year=1988&dcn_num=1388025024213&ban_flag=Y

FILED DATE: 9/27/2018 1:26 PM 2018L010510

**Figure 2: TRI total air emissions (in pounds), by Sterigenics Willowbrook – Ethylene Oxide. 1988, 1995-2016**[26]

| Year | Pounds EtO |
|------|------------|
| 1988 | 97,518 |
| 1989 | - |
| 1990 | - |
| 1991 | - |
| 1992 | - |
| 1993 | - |
| 1994 | - |
| 1995 | 18,373 |
| 1996 | 22,420 |
| 1997 | 27,020 |
| 1998 | 32,200 |

| Year | Pounds EtO |
|------|------------|
| 1999 | 2,640 |
| 2000 | 7,628 |
| 2001 | 8,113 |
| 2002 | 6,957 |
| 2003 | 6,909 |
| 2004 | 5,312 |
| 2005 | 2,910 |
| 2006 | 4,274 |
| 2007 | 3,966 |

| Year | Pounds EtO |
|------|------------|
| 2008 | 3,858 |
| 2009 | 3,690 |
| 2010 | 7,151 |
| 2011 | 7,160 |
| 2012 | 7,091 |
| 2013 | 6,133 |
| 2014 | 5,241 |
| 2015 | 4,899 |
| 2016 | 4,205 |

---

[26]

https://iaspub.epa.gov/triexplorer/release_trends?tri=60521GRFFT7775Q&p_view=TRYR&trilib=TRIQ1&sort=_V
IEW_&sort_fmt=1&state=All+states&county=All+counties&chemical=000075218&industry=ALL&core_year=&t
ab_rpt=1&FLD=AIRLBY&FLD=E1&FLD=E2&FLD=E3&FLD=E4&FLD=F41&FLD=E42&FLD=E5&FLD=E5
2&FLD=E53&FLD=E53A&FLD=E53B&FLD=F54&FLD=E51&FLD=E51A&FLD=E51B&FLD=TSFDSP&FLD
=m10&FLD=m41&FLD=m62&FLD=potwmetl&FLD=m71&FLD=m81&FLD=m82&FLD=m72&FLD=m63&FL
D=m64&FLD=m65&FLD=m66&FLD=m67&FLD=m73&FLD=m79&FLD=m90&FLD=m94&FLD=m99&FLD=
RELLBY

FILED DATE: 9/27/2018 1:26 PM    2018L010510

**Figure 3: TRI total air emissions reported (in pounds), by Sterigenics Willowbrook – Ethylene Oxide, 1995-2016. [27] [28]**



49.      Nor was passive venting the only manner in which Sterigenics exposed area residents, workers, and students to EtO. Sterigenics has also made at least one mass "uncontrolled release" of EtO. In 2015, Sterigenics signed a consent order with the State of Illinois in response to an October 7, 2013 release of ethylene glycol (an EtO byproduct) into the soil and groundwater surrounding the Willowbrook plant and another uncontrolled release of EtO into the atmosphere (See "Consent Order," attached as Exhibit B). Sterigenics initially reported that it had released 30 pounds of EtO into the atmosphere in this incident, but subsequently revised its estimate to 12 pounds. Sterigenics ultimately paid a $50,000 civil penalty for these uncontrolled releases.

---

[27] Source: Toxic Release Inventory (TRI): https://www.epa.gov/enviro/tri-overview.
[28] Exhibit A, page 2.

16

FILED DATE: 9/27/2018 1:26 PM   2018L010510

50.     Notably, even after this incident, Sterigenics did not install control measures on the vents that freely allowed EtO to disperse into the atmosphere.

51.     Nor did Sterigenics' EtO emissions, once released, disperse far. The half-life of EtO in the atmosphere is roughly 211 days. According the IARC, "[n]either rain nor absorption of aqueous aerosols is capable of removing ethylene oxide from the atmosphere."[29] In addition, EtO is heavier than air, meaning that it can linger and travel along the ground.[30] Consequently, Sterigenics' releases of EtO are likely to have lingered at breathing level in the area around its facility for a considerable time, causing ongoing harm the Plaintiffs.

## C. Sterigenics' Activity in Willowbrook Is Part of a Broader Pattern of Behavior

52.     Sterigenics' behavior in Willowbrook fits into a broader pattern of recklessness related to its EtO facilities.

53.     Between 2004 and 2009, Sterigenics released excessive amounts of EtO into the atmosphere from its sterilizing facility in the Dutch town of Zoetermeer. The excess EtO was reportedly due to Sterigenics failure to replace broken filters.[31] Like the Willowbrook plant, the Zoetermeer facility was set amidst a residential neighborhood, meaning that approximately 2,000 residents were potentially exposed.[32] Sterigenics ultimately shut down and demolished the Zoetermeer plant.[33]

---

[29] https://monographs.iarc.fr/wp-content/uploads/2018/06/mono100F-28.pdf *accessed 9.25.2018.*
[30] http://www.inchem.org/documents/icsc/icsc/eics0155.htm *accessed 9.25.2018.*
[31] https://www.omroepwest.nl/nieuws/3574491/Rechtszaak-tegen-gifuitstoter-Sterigenics-na-jaren-van-start-Hoe-zat-het-ook-alweer *accessed 9.25.2018.*
[32] https://www.omroepwest.nl/nieuws/2648769/Niet-vaker-kanker-rondom-Sterigenics-in-Zoetermeer *accessed 9.25.2018.*
[33] https://www.dutchnews.nl/news/2010/07/zoetermeer_shuts_firm_for_brea/ & https://www.zoetermeer.nl/inwoners/uitstoot-schadelijke-stoffen-bij-sterigenics_46553?pk_campaign=Redirects&pk_kwd=sterigenics *accessed 9.25.2018.*

54.     In the U.S., Sterigenics' California facilities have a history of regulatory problems. Sterigenics was investigated and fined $450,000 by the U.S. Department of Justice (DOJ) in 2015 for failing "to keep and maintain adequate records pertaining to controlled substances." Specifically, the DOJ found that between April 4, 2011 and April 4, 2013, Sterigenics failed compliance with the Controlled Substance Act at least 156 times.[34]

55.     More seriously, Sterigenics failed to properly train employees in the safe use of EtO at its sterilizing plant in Ontario, California, causing a major EtO explosion on August 19, 2004 that injured four employees and forcing the evacuation of the plant and neighboring facilities. The U.S. Chemical Safety and Hazard Investigation Board (CSB) investigation into the incident found that Sterigenics had failed to ensure its maintenance employees understood the hazards associated with EtO-based processes, which led them to manually override safety devices, causing the explosion. The CSB faulted Sterigenics management for not implementing "company-wide engineering control recommendations that could have prevented this explosion" and failing to follow recommendations on EtO concentrations disseminated by NIOSH.[35]

56.     At Sterigenics' Willowbrook, Illinois facility, OSHA records several safety violations for which the company has paid thousands of dollars in fines.[36] Specifically, Sterigenics paid $5,062 in fines in 2006 for several "Serious" violations that left workers exposed to unspecified "highly hazardous chemicals." [37] Given the work undertaken at the Willowbrook facility, these "highly hazardous chemicals" likely included EtO.

---

[34] https://www.justice.gov/usao-ndca/pr/bay-area-company-agrees-pay-450000-settle-claims-failing-maintain-adequate-records *accessed 9.25.2018.*

[35] https://www.csb.gov/assets/1/20/sterigenics_report.pdf?13828 *accessed 9.25.2018.*

[36] E.g. https://www.osha.gov/pls/imis/establishment.inspection_detail?id=308153717 *accessed 9.25.2018.*

[37] https://www.osha.gov/pls/imis/establishment.inspection_detail?id=308153717 &
https://www.osha.gov/pls/imis/establishment.violation_detail?id=308153717&citation_id=01001 *accessed 9.25.2018.*

FILED DATE: 9/27/2018 1:26 PM 2018L010510

57.     Current and former Sterigenics employees have also raised concerns about company safety practices around EtO. For instance, on the company's Glassdoor page, one former employee noted on June 25, 2013 that "[t]here is a minimum attention to quality & safety which will backfire eventually."[38] Another stated on October 9, 2015 that "you're working with Ethylene Oxide which is extremely dangerous and the company seems to cut corners around safety at times."[39] Perhaps most concerning, an "EtO A Operator" in the Charlotte, North Carolina facility reported on February 24, 2015 that "Safety is an issue sometimes regarding procedures. The maintenance team cuts a lot of corners." This employee advised management to "Lock out the overrides for equipment. Fire any maintenance manager that shows operators how to manually operate equipment without it showing on the computer system."[40] Notably, this comment comes after the 2004 Ontario, California explosion. As discussed above, the CSB identified maintenance cutting corners and manually overriding equipment as factors leading to that incident. This employee review suggests that the safety and management failures that caused the California explosion were not addressed system-wide and continued to be in evidence at other Sterigenics facilities over a decade later.

58.     Taken together, these elements demonstrate a pattern of Sterigenics consistently failing to implement company-wide safety measures across all its facilities, despite research, NIOSH bulletins, regulatory interventions, and problematic incidents demonstrating their need. This willingness to "cut corners" and lack of oversight may explain why Sterigenics failed for decades to install emission mitigation technology to limit passive venting of EtO from its Willowbrook facility.

---

[38] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW2768416.htm *accessed 9.25.2018.*
[39] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW8236300.htm *accessed 9.25.2018.*
[40] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW5987616.htm *accessed 9.25.2018.*

FILED DATE: 9/27/2018 1:26 PM 2018L010510

### D. Willowbrook Air Quality and the Health Implications

59.     Scientific analysis demonstrates that Sterigenics failure to install appropriate emissions mitigation technology has exposed residents, workers, and students to hazardous levels of EtO for the last 34 years.

60.     The 2014 EPA NATA database already demonstrated unacceptably high levels of cancer risk in the area surrounding the Willowbrook plant. The database places the cancer risks of the land tracts measured in Willowbrook as the highest in Illinois and among the highest in the country (the tract upon which the Sterigenics facility sits is in the 99.98[th] percentile for cancer risk level in the U.S.).[41] These risk levels are comparable to those of "Cancer Alley," an area along the Mississippi River famous for high incidences of cancer.[42]

61.     The NATA database also makes clear that the elevated cancer risks around Willowbrook are primarily due to EtO emissions, attributing 88.98% of the risk to this source. Sterigenics is the only major emitter of EtO in this area. Notably, this data was collected **before** the EPA revised the way it calculated the carcinogenicity of EtO to accommodate "a 30-fold increase in cancer potency" (Ex. A, pg. 2).

62.     As discussed earlier, the EPA generally considers the maximum "acceptable risk" for air toxics to be roughly a 100 per million (i.e., for every one million people exposed, 100 develop cancer over their lifetimes).[43] However, a 2014 EPA National Air Toxics Assessment (NATA) found the lifetime cancer risk in the tract of land upon which the Sterigenics plant sits (Tract ID # 17043845902) to be 281.8075 per million, almost three times the maximum acceptable level.

---

[41] https://www.epa.gov/national-air-toxics-assessment *accessed 9.25.2018.*

[42] http://www.chicagotribune.com/news/local/breaking/ct-met-dupage-cancer-pollution-rauner-20180827-story.html *accessed 9.25.2018.*

[43] https://www.epa.gov/national-air-toxics-assessment/nata-frequent-questions *accessed 9.25.2018.*

FILED DATE: 9/27/2018 1:26 PM    2018L010510

63.     Figure 4 below depicts a 2014 NATA map demonstrating above-acceptable levels (>100 per million) of cancer risk in the tracts surrounding the Willowbrook facility:

**Figure 4: 2014 NATA map depicting levels of lifetime cancer risk surrounding the Willowbrook Sterigenics facility**



64.     More recently, for the August 21, 2018 evaluation of the Willowbrook plant's EtO emissions, the EPA modeled short and long-term ambient EtO concentrations around the facility to determine the impact of site emissions. (See Figure 3 on Ex. A, pg. 4).

65.     Figure 5 shows large amounts of EtO emissions surrounding both Sterigenics buildings and pervading the community up to a one-mile radius.

66.     Figure 5 also depicts a 5-year average to represent chronic exposures and maximum 1- and 8-hour averages to represent acute exposures at 882 community receptor points.

FILED DATE: 9/27/2018 1:26 PM 2018L010510

**Figure 5. AERMOD modeling output: 5-year average exposure estimates**



67.     The U.S. EPA collected 39 air samples from 26 discrete locations in the Willowbrook community on May 16 and 17, 2018 using SUMMA canisters. (Ex. A, pg. 5).

68.     SUMMA canisters are "airtight, stainless-steel containers with an inner surface that has been electro-polished and chemically deactivated," ensuring an accurate air sample is collected. (Ex. A, pg. 5).

22

FILED DATE: 9/27/2018 1:26 PM 2018L010510

69.     Based on the samples collected, "chronic upper bound residential (2.1 μg/m3) and occupational (9.1 μg/m3) exposures in the community" existed, with higher concentrations during the nighttime. (Ex. A, pg. 7).

**Figure 6. Site-specific ADAF calculations for residential exposure**

| Age Range | ADAF | U.S. EPA unadjusted | EPC (μg/m³) | Duration Adjustment | Partial Risk |
|---|---|---|---|---|---|
| 0 to <2 yrs | 10 | $2.99 \times 10^{-3}$ | 2.1 | 2 years/78 years | $1.6 \times 10^{-3}$ |
| 2 to <16 yrs | 3 | $2.99 \times 10^{-3}$ | 2.1 | 14 years/78 years | $3.4 \times 10^{-3}$ |
| 16 to 33 yrs | 3 | $2.99 \times 10^{-3}$ | 2.1 | 17 years/78 years | $1.4 \times 10^{-3}$ |
| | | | | Lifetime Risk | $6.4 \times 10^{-3}$ |

70.     Ultimately, the August 21, 2018 report calculated that Sterigenics' EtO emissions caused "an additional lifetime risk of 6.4 cancers in a population of 1,000 residents who could be exposed to EtO emissions from Sterigenics," equivalent to 6,400 per million (Ex. A., pg. 10). These updated calculations place the area's cancer risk at 64 times the EPA's maximum acceptable risk level.

71.     It should also be noted that, if anything, the EPA samples and models are a massive underestimate for the ambient levels of EtO the area has been exposed to in the last 34 years. As noted earlier, total EtO air releases from the Willowbrook facility were over 20 times higher in 1988 than in 2016 (2016 levels are presumably comparable to present release levels). In addition, release levels in the late 1990s were still up to 7.7 times higher than 2016 levels.

72.     Throughout the period of exposure, the area immediately around the Willowbrook plant has contained numerous homes and businesses, as well as four schools and a daycare facility (See Figure 2 on Ex. A, pg. 3). As a result, thousands of residents, workers, and students have been exposed to elevated levels of EtO. Figure 7 demonstrates the proximity of these facilities to the Willowbrook plant:

FILED DATE: 9/27/2018 1:26 PM 2018L010510

**Figure 7. Aerial map of the community surrounding Sterigenics Corporation[44]**



Source: Tribune reporting                                          @ChiTribGraphics

73.     One of the schools near the Sterigenics facility is Gower West Elementary School,

with recent enrollment of almost 500 students.[45] Another is Hinsdale South High School, with

enrollment of over 1,500 students.[46] Hinsdale South High School has been open and active at

its present locations since prior to the Sterigenics facility's opening in 1984. Consequently,

thousands of minors have been exposed to unsafe levels of EtO over the years both in

classrooms and outdoor athletic facilities.

74.     The EPA notes that EtO exposure could have especially deleterious effects on

children, as "the immaturity of *detoxifying* enzymes in very young children may increase

---

[44] http://www.chicagotribune.com/news/local/breaking/ct-met-sterigenics-cancer-risks-politics-20180919-story,amp.html *accessed 9.25.2018.*

[45] http://webprod.isbe.net/ereportcard/publicsite/getReport.aspx?year=2017&code=1902206202002_e.pdf *accessed 9.25.2018.*

[46] http://webprod.isbe.net/ereportcard/publicsite/getReport.aspx?year=2017&code=1902208600002_e.pdf *accessed 9.25.2018.*

24

FILED DATE: 9/27/2018 1:26 PM 2018L010510

children's susceptibility because children may clear EtO at a slower rate than adults... In the absence of data on the relative susceptibility associated with EtO exposure in early life, increased early-life susceptibility is assumed."[47] Thus it is likely that students at schools within a one-mile radius of the Willowbrook facility in the 1980s and 1990s were particularly vulnerable to the mutagenic effects of EtO.

75.     Although apprised of the severe dangers associated with EtO, Sterigenics nonetheless willfully and negligently emitted large amounts of this toxic gas from its Willowbrook facility for 34 years. Moreover, Sterigenics failed to warn those near its plant of their exposure to EtO and the risks to their health this exposure entailed. Consequently, Sterigenics exposed Plaintiffs and thousands like them to devastating health consequences.

**COUNT I**
(Nuisance )

76.     Plaintiffs reallege and incorporate herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

77.     At all times relevant hereto, Defendants knew EtO to be hazardous and harmful to human beings.

78.     Article XI of the Illinois Constitution of 1970, Environment, Section 1, Public Policy - Legislative Responsibility, provides that:

> The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy."

79.     Article XI of the Illinois Constitution of 1970, Environment, Section 2, Rights of Individuals, provides that:

> Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal

---

[47] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/1025tr.pdf at pg. 3-71. *Accessed 9.25.2018.*

proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law.

80.    At all times relevant to this claim, Plaintiffs had the right to a healthful environment while living and working in the State of Illinois.

81.    At all times relevant to this claim, Defendants owed a duty to the public, including Plaintiffs and other person whom they could reasonably foresee were likely to be in or near the areas exposed to EtO emitted from Defendants' sterilizing facility, to provide and maintain a healthful environment in connection with their operation, maintenance, and use the sterilizing facility.

82.    As a direct and proximate result of Defendants' operation, maintenance, and use of its sterilizing facility, Plaintiffs were continuously exposed to elevated and hazardous levels of EtO, placing them at an increased risk of cancer and denying them their right to healthful environment.

83.    As a direct and proximate result of Defendants' operation, maintenance, and use of its sterilizing facility, EtO continuously invaded and caused to be contaminated the areas immediately surrounding and on Plaintiffs' properties.

84.    As a direct and proximate result of Defendants' operation, maintenance, and use of its sterilizing facility, Plaintiffs sustained and will continue to sustain severe and permanent physical damage to their properties and damage to their property value due to the decades long emission of EtO.

85.    Plaintiffs bring this action for all monetary damages associated with its EtO contamination, including damages for reduction of value of their property. Finally, Plaintiffs request that Defendants be required to pay the costs associated with remediating all EtO contamination that is located on or threatens their property.

FILED DATE: 9/27/2018 1:26 PM    2018L010510

FILED DATE: 9/27/2018 1:26 PM 2018L010510

Wherefore Plaintiffs demand judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

### COUNT II
(Trespass)

86.     Plaintiffs reallege and incorporate herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

87.     Defendants have trespassed through unlawful, unauthorized, and wrongful entry and damage to Plaintiffs' land by depositing airborne and waterborne particles of radiation and other hazardous materials on the Plaintiffs' properties without their permission or invitation.

88.     Defendants were aware that trespass was occurring.

89.     This trespass has caused actual and substantial damage to the Plaintiffs' properties, and has interfered with the Plaintiffs exclusive possession of their properties. This trespass is continuing and ongoing.

90.     Defendants have indirectly interfered with Plaintiffs possessory rights due to migration of EtO emitting from its sterilizing facility. This interference was unreasonable and foreseeable.

91.     As a direct and proximate result of Defendants' trespass, Plaintiffs' properties sustained and will continue to sustain severe and permanent physical damages by EtO contamination.

92.     Plaintiffs bring this action for all monetary damages associated with its EtO contamination, including damages for reduction of value of their property. Finally, Plaintiffs request that Defendants be required to pay the costs associated with remediating all EtO contamination that is located on or threatens their property.

FILED DATE: 9/27/2018 1:26 PM  2018L010510

Wherefore Plaintiffs demand judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

## COUNT III
(Fraudulent Concealment)

93.     Plaintiffs reallege and incorporate herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

94.     Since 1984, Defendants had actual or constructive knowledge of the highly carcinogenetic nature of EtO and deliberately hid and/or suppressed information pertaining to the highly carcinogenetic nature of EtO from Willowbrook residents, workers, and visitors.

95.     As a direct and proximate result of Defendants' deliberate hiding and/or suppression of information pertaining to the highly carcinogenetic nature of EtO, Plaintiffs have suffered severe and permanent health problems and have endured and will in the future endure pain and suffering; have suffered a loss of the enjoyment of a normal life; have endured and will in the future endure emotional distress; have incurred and will in the future incur expenses for medical and rehabilitative care; have suffered a loss of earnings; and have been damaged in their capacity to earn a living.

Wherefore Plaintiffs demand judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

FILED DATE: 9/27/2018 1:26 PM 2018L010510

## JURY DEMAND

All Plaintiffs demand trial by jury.

Respectfully Submitted,

By: /s/Todd A. Smith
One of Their Attorneys

Todd A. Smith, tsmith@prslaw.com
Brian LaCien, blacien@prslaw.com
POWER, ROGERS & SMITH, LLP
70 West Madison Street, 55th Floor
Chicago, IL 60602-4212
Phone: (312) 236-9381
Fax: (312) 236-0920

John Libra, jlibra@koreintillery.com
KOREIN TILLERY, LLC
205 North Michigan Avenue
Suite 1950
Chicago, IL 60601
Office: 312-641-9750

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

NEIL GRAVES, Individually and On Behalf of All Those
Similarly Situated;
MARJORIE GRAVES, Individually and On Behalf of All
Those Similarly Situated.

        Plaintiffs,

    v.                              No: 2018 L 010183

STERIGENICS U.S., LLC; and
GTCR LLC.

        Defendants.

## AFFIDAVIT REGARDING DAMAGES SOUGHT

Plaintiffs NEIL GRAVES, Individually and On Behalf of All Those Similarly Situated and

MARJORIE GRAVES, Individually and On Behalf of All Those Similarly Situated, by their attorney,

Todd A. Smith, being first duly sworn under oath, states as follows:

1.    That the affiant is one of the attorneys of record for the Plaintiffs in this matter.

2.    That the total money damages sought in this civil action exceed the amount of

$50,000.00.

Further Affiant Sayeth Not.

                                             _____
                                            TODD A. SMITH

SUBSCRIBED AND SWORN to before me
this 27th day of September 2018.

_____
NOTARY PUBLIC

OFFICIAL SEAL
STACEY DALTON
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:09/04/22

POWER ROGERS & SMITH, LLP
70 W. Madison Street, 55th Floor
Chicago, IL  60602-4212
312-236-9381
31444

OFFICIAL SEAL
STACEY DALTON
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 09/04/22

FILED DATE: 9/27/2018 1:26 PM   2018L010510

# Letter Health Consultation

"Evaluation of Potential Health Impacts from Ethylene Oxide Emissions"

STERIGENICS INTERNATIONAL, INC.

WILLOWBROOK, ILLINOIS

AUGUST 21, 2018

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**
Agency for Toxic Substances and Disease Registry
Division of Community Health Investigations
Atlanta, Georgia  30333

EXHIBIT
_A_

FILED DATE: 9/27/2018 1:26 PM  2018L010510

## Health Consultation: A Note of Explanation

An ATSDR health consultation is a verbal or written response from ATSDR to a specific request for information about health risks related to a specific site, a chemical release, or the presence of hazardous material. In order to prevent or mitigate exposures, a consultation may lead to specific actions, such as restricting use of or replacing water supplies; intensifying environmental sampling; restricting site access; or removing the contaminated material.

In addition, consultations may recommend additional public health actions, such as conducting health surveillance activities to evaluate exposure or trends in adverse health outcomes; conducting biological indicators of exposure studies to assess exposure; and providing health education for health care providers and community members. This concludes the health consultation process for this site, unless additional information is obtained by ATSDR which, in the Agency's opinion, indicates a need to revise or append the conclusions previously issued.

You May Contact ATSDR TOLL FREE at
1-800-CDC-INFO
or
Visit our Home Page at: http://www.atsdr.cdc.gov

FILED DATE: 9/27/2018 1:26 PM   2018L010510

LETTER HEALTH CONSULTATION


"Evaluation of Potential Health Impacts from Ethylene Oxide Emissions"

STERIGENICS INTERNATIONAL, INC.

WILLOWBROOK, ILLINOIS


Prepared By:

U.S. Department of Health and Human Services
Agency for Toxic Substances and Disease Registry
Division of Community Health Investigations



**DEPARTMENT OF HEALTH & HUMAN SERVICES**
*Agency for Toxic Substances and Disease Registry,*
*Region 5*

*Public Health Service*
*77 W. Jackson Blvd., Room 413*
*Chicago, IL 60604*

July 26, 2018 *

Ed Nam
Director, Air and Radiation Division
United States Environmental Protection Agency, Region 5
77 W. Jackson Blvd., MS A-18J
Chicago, IL 60604

Dear Mr. Nam:

Since February 2018, ATSDR has met with U.S. EPA Region 5 Air and Radiation Division (ARD) staff regarding a change in the cancer risk basis for ethylene oxide (EtO) in the EPA Integrated Risk Information System (IRIS) and how that change affects general population risks estimated from EtO-emitting facilities in the draft 2014 National Air Toxics Assessment (NATA) update[1]. In December 2016, IRIS changed EtO's adult-based inhalation unit risk from 0.0001 per microgram per cubic meter ($\mu g/m^3$) to 0.003 per $\mu g/m^3$, a 30-fold increase in cancer potency. It also changed EtO's cancer weight-of-evidence descriptor from "probably carcinogenic to humans" to "carcinogenic to humans". These changes could result in many census tracts having estimated cancer risks that are greater than 1 in 10,000 from EtO exposure identified through the draft NATA modeling of air emissions across the United States.

Specifically, ARD decided to evaluate the implications of this change at two sites, Sterigenics International, Inc. (referred to in the letter as "*Sterigenics*") in Willowbrook, IL and the Elé Corporation in McCook, IL. This letter addresses EtO emissions from the Sterigenics facility. In June 2018, after the monitoring results were received and reviewed, ARD requested that ATSDR review air measurements of EtO and modeling results of EtO emissions from Sterigenics and specifically answer the question: *If modeled and measured ethylene oxide concentrations represent long term conditions, would they pose a public health problem for people living and working in Willowbrook?*

The air modeling data that U.S. EPA provided to ATSDR estimated potential short-term and long-term concentrations of EtO in ambient air surrounding the Sterigenics Corporation. Follow-up air monitoring data confirm the presence of elevated EtO at concentrations within a similar range to those estimated by the air modeling of Sterigenics emissions. Based on these measured and modeled concentrations and the proximity to residences and other commercial structures, cancer risks higher than 1 in 10,000 people may exist for some community members and workers exposed to airborne EtO in this community. If these measured and estimated concentrations represent chronic exposures

---

* Minor edits to the reference list have been incorporated into the final posted ATSDR Letter Health Consultation.

[1] The 2014 NATA is expected to be publicly available in the fall of 2018.

FILED DATE: 9/27/2018 1:26 PM   2018L010510

in the surrounding community (with higher exposures likely for workers of the facility), EtO emissions from the Sterigenics Corporation poses a public health hazard.

**BACKGROUND**

Sterigenics provides sterilization processes using gamma, ethylene oxide, Ebeam, and X-ray sterilization and operates 46 facilities in 13 countries (Sterigenics, 2018). The facility stores ethylene oxide that is sprayed into sealed chambers to sterilize medical equipment, pharmaceuticals, and food/spice products contained on 40" x 48" pallets. The sterilization chambers are contained in two buildings. Building 1 has fifteen chambers that can hold 1 to 13 pallets, while Building 2 has four sterilization chambers that can hold 13 to 26 pallets (Illinois EPA, 2017). Building 1 chambers were constructed in 1984, while Building 2 chambers were built in 1999 and 2012. Pollution control technology includes acid water scrubbers and dry bed reactors that convert the ethylene oxide to ethylene glycol after the sterilization process (Illinois EPA, 2015). Although back vents on the units have historically been uncontrolled, Sterigenics is currently in the process of installing pollution controls to control passive releases (ATSDR, 2018).

Figure 1 illustrates the total reported emissions in pounds per year (lbs/yr) of EtO from Sterigenics.

**Figure 1. TRI Total Air Emissions Reported (in pounds), by Sterigenics Corporation for Ethylene Oxide, 1995-2016**



[a]Source: Toxic Release Inventory (TRI): https://www.epa.gov/enviro/tri-overview
[b]Dates for facility constructed and upgrades were identified according to Illinois EPA (2017) DRAFT/PROPOSED Clean Air Act Permit Program (CAAPP) Permit

FILED DATE: 9/27/2018 1:26 PM   2018L010510

The emissions data show a substantial reduction in total air releases after 1998. No data are available before 1995 on ambient air releases, but the available data suggests that substantially higher ambient releases prior to 1995 were likely. The Building 1 sterilization chambers were constructed in 1984, therefore EtO has been emitted over the past 34 years from the Willowbrook facility.

Willowbrook, Illinois is a small suburb of Chicago with approximately 8,500 residents (U.S. Census, 2016). The Willowbrook industrial complex where Sterigenics is located is in a densely populated metropolitan area, with 19,271 people living within 1 mile of the facility boundary. There are four schools and one daycare facility within 1 mile of the facility. According to 2016 Census estimates, Willowbrook residents are predominately white (73.3%), non-Hispanic (66.6%), educated (97.7% graduate high school, and 48.9% graduated with a bachelor's degree or higher), and middle class (median household income was over $67,000 per year). Approximately 18.5% of the population is identified as Asian, and 6.3% as black.

**Figure 2. Aerial map of the community surrounding Sterigenics Corporation**



*Source: Google Earth*

FILED DATE: 9/27/2018 1:26 PM  2018L010510

## ENVIRONMENTAL DATA

*Air Modeling*

U.S. EPA modeled short and long-term ambient EtO concentrations (AERMOD version 18081) to evaluate the potential impact of site emissions. These scenarios estimated a 5-year average to represent chronic exposures and maximum 1- and 8-hour averages to represent acute exposures at 882 community receptor points. An overlay of the modeling output is displayed in Figure 3, below. The statistical distributions of the modeled air concentrations are presented in Table 1.

**Figure 3. AERMOD modeling output: 5-year average exposure estimates**



Source: U.S. EPA Air and Radiation Division, Region 5
Note: Source 1 is Sterigenics Willowbrook Building 1, and Source 2 is Sterigenics Willowbrook Building 2

4

FILED DATE: 9/27/2018 1:26 PM    2018L010510

**Table 1. Statistical distribution of EtO modeling\***

| Statistics | Modeled 1-hour (µg/m³) | Modeled 8-hour (µg/m³) | Modeled 5-year (µg/m³) |
|---|---|---|---|
| Minimum | 2.17 | 1.02 | 0.03 |
| 25th Percentile | 4.62 | 2.26 | 0.09 |
| 50th Percentile | 9.72 | 4.07 | 0.17 |
| 75th Percentile | 18.88 | 7.29 | 0.31 |
| 90th Percentile | 33.90 | 12.62 | 0.57 |
| 95th Percentile | 45.22 | 18.83 | 0.91 |
| 99th Percentile | 134.73 | 61.39 | 2.97 |
| Maximum | 249.77 | 123.89 | 13.32 |
| Mean | 15.75 | 6.72 | 0.32 |
| Geometric Mean | 10.13 | 4.41 | 0.18 |

*\*N= 882 modeled receptors*

### Air Measurements

U.S. EPA collected 39 validated samples May 16th and May 17th, 2018. These samples were collected using SUMMA® canisters, and analyzed using U.S. EPA Compendium Method TO-15, Compendium of Methods for the Determination of Toxic Organic Compounds in Ambient Air. A SUMMA® canister is an airtight, stainless-steel container with an inner surface that has been electro-polished and chemically deactivated. The laboratory is required to clean each canister and evacuate it to a high vacuum prior to shipping it to the sampling location. A canister can hold the vacuum for up to 30 days. The air being sampled is "drawn" into the canister by the high vacuum, thus eliminating the need for a pump. While opening the inlet orifice fills the canister in less than a minute, yielding an instantaneous "grab" sample, regulators can be added to the inlet orifice to draw the air into the canister over a designated period, ranging from 1 to 24-hours.

Of the 39 samples collected at 26 discrete locations (Figure 4), 18 were 12-hour samples, and 21 were grab samples (Table 2). Three of the 12-hour samples were collocated duplicates, and three of the grab samples were collocated duplicates. Grab samples generally had lower EtO concentrations than 12-hour averaged samples (U.S. EPA, 2018). However, all grab samples were collected between 10:20 am and 3:05 pm. ARD staff noted that higher EtO concentrations were measured overnight than during the day, and 12-hour samples were collected overnight in some locations. Since Sterigenics is a 24-hour operation, this may be due to calm meteorological conditions overnight with a higher potential for inversions. Given the elevated detections over a limited duration, additional long-term sampling is warranted to better characterize residential exposure to EtO.

FILED DATE: 9/27/2018 1:26 PM   2018L010510

**Table 2. Statistical distribution of residential and commercial EtO air sampling\***

| Statistics | Grab samples (µg/m³) | 12-hour samples (µg/m³) |
|---|---|---|
| Min | 0.16 | 0.34 |
| 25th Percentile | 0.24 | 0.69 |
| 50th Percentile | 0.45 | 1.56 |
| 75th Percentile | 1.34 | 4.39 |
| 90th Percentile | 2.28 | 8.26 |
| 95th Percentile | 4.27 | 8.44 |
| 99th Percentile | 4.33 | 8.96 |
| Max | 4.34 | 9.09 |
| Mean | 1.07 | 3.02 |
| Geo Mean | 0.62 | 1.74 |

*\*N=21 grab samples, 18 12-hour samples*

**Figure 4. Ambient air samples near the Sterigenics facility, Willowbrook, IL**



*Source: U.S. EPA, Region 5*

FILED DATE: 9/27/2018 1:26 PM   2018L010510

Figure 4, shows the location of discrete samples collected in the community. Given limited measured data presented in Table 2, ATSDR used the maximum 12-hour residential sample concentration and the maximum 12-hour commercial sample concentration to represent chronic upper bound residential (2.1 µg/m³) and occupational (9.1 µg/m³) exposures in the community. These concentrations represent maximums identified during a very temporally and spatially limited sampling campaign and actual average long-term exposures may be higher or lower.

## HEALTH IMPLICATIONS

### *Overview for identifying contaminants of concern and evaluating risk*
To evaluate EtO exposures near Sterigenics, ATSDR considered its own health-based comparison values as well as those published by other agencies. ATSDR uses comparison values for screening purposes to determine whether a pollutant should be evaluated further. A CV was identified for both an intermediate exposure duration (for non-cancer evaluation) as well as for a long-term (chronic) exposure duration (for which we considered both cancer and non-cancer health effects). In this evaluation, the air sampling results were compared to the ATSDR Cancer Risk Evaluation Guide (CREG) and environmental media evaluation guide (EMEG) and California EPA Reference Exposure Level (REL) for EtO.

- *ATSDR CREGs* are estimates of the concentrations of a carcinogen at which there is an elevated risk for one additional case of cancer in one million people exposed over a lifetime. ATSDR's CREG for EtO is calculated from the current U.S. EPA's adult-based inhalation unit risk value (0.003 (µg/m³)⁻¹) and is based on U.S. EPA evaluations and assumptions about hypothetical cancer risks at low levels of exposure. ATSDR's CREG for EtO is 0.00021 µg/m³.
- *ATSDR inhalation minimal risk levels (MRL)/EMEGs* are estimates of the concentrations of pollutants calculated that anyone could be exposed to where health effects are unlikely, based on chronic, intermediate, and acute exposures (those occurring longer than 365 days, between 14-365 days, and 14 days of exposure or less, respectively). For EtO, ATSDR only has an intermediate EMEG of 160 µg/m³ (ATSDR, 1990).
- *California RELs* are concentrations that are unlikely to result in adverse non-cancer health effects. The chronic California REL for EtO is 30 µg/m³ (California EPA, 2008).

All 5-year modeled and 12-hour measured averages exceeded the ATSDR CREG. Only maximum modeled concentrations exceeded intermediate or chronic non-cancer screening values. The following sections evaluate chronic non-cancer and cancer risks further.

### *Ethylene oxide properties*
Ethylene oxide is a highly flammable gas that is highly reactive with nucleophilic substances such as water, alcohols, halides, amines, and sulfhydryl compounds. It is used as an intermediate in the production of ethylene glycol and surfactants as well as a fumigant for sterilizing foods and heat-sensitive medical equipment.

EtO is highly reactive, readily absorbed, and easily distributed in the human body. The absolute odor threshold has been reported in several studies to be about 470 milligrams per cubic meter (mg/m³)

FILED DATE: 9/27/2018 1:26 PM 2018L010510

(or 470,000 µg/m³), with acute health effects possible in the range of the odor threshold (NRC, 2010). Chronic exposures can result somatic cell damage at much lower concentrations (California EPA, 2008). EtO is mutagenic and causes chromosome damage in many species, including humans. EtO exposure has widely been studied in scientific literature and its adverse health impacts are well understood. The carcinogenic effects of EtO have been documented in human and animal studies (U.S. EPA 2016).

### *Acute and intermediate exposure and health effects*

Acute and intermediate effects have mostly been documented in hospital workers or in other occupational settings that include sterilizing chambers. Short-term exposure (minutes to weeks or months) above the odor threshold of 470 mg/m³ (into the thousands of mg/m³) include primarily neurological effects (headache, dizziness, nausea, lethargy, fatigue, muscle weakness, numbness, memory loss, incoordination, etc.), respiratory irritation (irritation of the nasal cavity, sinuses, coughing, shortness of breath, wheezing, and bronchial constriction and hyperreactivity), excessive thirst and dry mouth, and gastrointestinal effects (vomiting, diarrhea, stomach spasms, etc.). Some studies reported skin rashes with short-term exposures (NRC, 2010).

All studies with documented health effects summarized above had substantially higher EtO concentrations than what was observed in measured and modeled data in this assessment. ATSDR does not have an acute health-based comparison value but does have an intermediate-duration health-based comparison value of 160 µg/m³. No measured data and only the maximum 1-hour modeled concentration of EtO exceeded this value and modeled and measured concentrations of EtO in this investigation were well below the odor threshold. Thus, it is unlikely that the non-cancer health effects noted above would occur in the general or off-site worker populations.

### *Chronic exposure and health effects*
#### *Cancer effects*

The U.S. EPA IRIS released an "Evaluation of the Inhalation Carcinogenicity of Ethylene Oxide" in December 2016. This evaluation summarizes the evidence that EtO is "carcinogenic to humans" through a mutagenic mode of action (MOA) and derives an inhalation unit risk value for EtO (U.S. EPA, 2016). Many studies have identified the genotoxic potential and mutagenic mode of action of EtO exposure via inhalation. There is clear evidence from multiple studies that EtO causes chromosomal aberrations, sister chromatic exchanges, and micronuclei in peripheral blood lymphocytes and bone marrow cells. Chromosomal aberrations and micronucleus frequency have been linked to increased risk of cancer in a number of large human studies (Jinot et al., 2017). Mice and rats exposed to EtO demonstrate cancers of the lymphohematopoietic system (cells involved in the production of lymphocytes and cells of blood, bone marrow, spleen, lymph nodes, and thymus), brain, lung, connective tissue, uterus, and mammary gland.

In humans, an increased incidence and mortality of breast and lymphohematopoietic system cancers have been observed in workers in the EtO manufacturing and in sterilizing facilities (U.S. EPA, 2016). U.S. EPA identified six studies evaluating breast cancer in women, with the largest being a study from the National Institute of Occupational Safety and Health (NIOSH) of over 18,000 workers (45% male, 55% female) in 14 commercial sterilization plants. The NIOSH study reported statistically significant

FILED DATE: 9/27/2018 1:26 PM 2018L010510

exposure-response relationships for breast cancer incidence and mortality (Steenland et al., 2003 and Steenland et al., 2004). From assessing these studies, U.S. EPA (2016) determined that there is sufficient evidence of a causal relationship between EtO exposure and breast cancer in women.

U.S. EPA used the cancer incidence data from the NIOSH study, using individual exposure estimates for 17,530 workers from 13 plants, to calculate an inhalation unit risk value. A linear low-dose extrapolation of the lowest effective concentration (LEC; defined here as the lower 95% confidence limit on the $EC_{01}$, the estimated effective concentration associated with 1% extra risk) for lymphoid cancer was calculated as $2.9 \times 10^{-3}$ per $\mu g/m^3$. Using the same approach, the lifetime unit risk for breast cancer was calculated as $8.1 \times 10^{-4}$ per $\mu g/m^3$. Combining the risk for lymphoid and breast cancers in females U.S. EPA adopted an inhalation unit risk of $2.99 \times 10^{-3}$ per $\mu g/m^3$ (rounded to $3.0 \times 10^{-3}$ per $\mu g/m^3$). These adult-exposure only unit risk estimates were then rescaled to a lifetime, using age-dependent adjustment factors (ADAF). ADAFs are used to incorporate the greater risk of early life exposure to chemicals that have a mutagenic MOA. When applying the ADAFs, EPA calculated an inhalation unit risk value over a 70-year lifetime of $5.0 \times 10^{-3}$ per $\mu g/m^3$ (U.S. EPA, 2016). Cancer risk from measured and modeled EtO concentrations are estimated by multiplying the IUR by the EtO concentrations.

*U.S. EPA Cancer Risk Estimates Reviewed by ATSDR*

U.S. EPA Region 5 air modelers estimated cancer risk assuming a 70-year lifetime from measured and modeled data. Based on measured EtO concentrations at over 882 specific locations around the Sterigenics facility, U.S. EPA used the 5-year average EtO concentrations to calculate lifetime cancer risks between $1.3 \times 10^{-4}$ to $6.7 \times 10^{-2}$, with a geometric mean risk of $9.1 \times 10^{-4}$. Even though cancer risks are not generally calculated for short term exposures, the estimated cancer risks associated with the *measured* EtO air concentration (19 samples collected for 12 hours each) were similar (range: $7.9 \times 10^{-4}$ to $4.5 \times 10^{-2}$, geometric mean: $7.7 \times 10^{-3}$; Table 3). Note that these cancer risks were calculated using the lifetime ADAF-adjusted IUR of $5.0 \times 10^{-3}$ per $\mu g/m^3$.

**Table 3. Range of measured and modeled EtO concentrations: U.S. EPA Cancer Risk Estimates**

| Statistics | Modeled 5-year ($\mu g/m^3$) | Modeled cancer risk range | 12-hour samples ($\mu g/m^3$) | Measured cancer risk range* |
|---|---|---|---|---|
| Minimum | 0.03 | 1.3E-04 | 0.16 | 7.9E-04 |
| Maximum | 13.32 | 6.7E-02 | 4.34 | 4.5E-02 |
| Mean | 0.32 | 1.6E-03 | 1.04 | 1.4E-02 |
| Geometric Mean | 0.18 | 9.1E-04 | 0.61 | 7.7E-03 |

*Cancer risk was calculated to estimate what long term exposures to the 12-hour concentration could look like if sustained long term and does not represent actual exposures.*

*Cancer Risk Estimates Calculated by ATSDR*

For ATSDR assessments, the reasonable maximum exposure (RME) scenario for residential exposure duration is 33 years over a lifetime of 78 years, so ATSDR calculated an IUR based on 33-year residential exposure using ADAFs. As mentioned previously, ATSDR's RME exposure point concentration (EPC) of 2.1 $\mu g/m^3$ was used as a reasonable estimate of exposure for the most exposed individual in the community. This EPC is the maximum residential sample concentration of EtO in the May 2018 data collection period. Given these assumptions, the cancer risk for this residential sample

FILED DATE: 9/27/2018 1:26 PM 2018L010510

location is **6.4 x 10⁻³**—an additional lifetime risk of 6.4 cancers in a population of 1,000 residents who could be exposed to EtO emissions from Sterigenics. This cancer risk exceeds U.S. EPA's decision-making cancer risk range of $1.0 \times 10^{-6}$ to $1.0 \times 10^{-4}$, and adds to the lifetime background cancer risk of an average American of 1 in 3 people (American Cancer Society, 2018).

**Table 4. Site-specific ADAF calculations for residential exposure\***

| Age Range | ADAF | U.S. EPA unadjusted IUR | EPC (µg/m³) | Duration Adjustment | Partial Risk |
|---|---|---|---|---|---|
| 0 to <2 yrs | 10 | $2.99 \times 10^{-3}$ | 2.1 | 2 years/78 years | $1.6 \times 10^{-3}$ |
| 2 to <16 yrs | 3 | $2.99 \times 10^{-3}$ | 2.1 | 14 years/78 years | $3.4 \times 10^{-3}$ |
| 16 to 33 yrs | 3 | $2.99 \times 10^{-3}$ | 2.1 | 17 years/78 years | $1.4 \times 10^{-3}$ |
| | | | | Lifetime Risk | $6.4 \times 10^{-3}$ |

*\*Cancer risk was calculated to estimate what long term exposures to the 12-hour concentration could look like if sustained long term and does not represent actual exposures.*

Likewise, ATSDR assumed the maximum commercial 12-hour sample concentration in commercial sample locations of 9.1 µg/m³ to represent RME occupational exposures to workers in nearby facilities. Note that workers at the Sterigenics facility would be covered under the Occupational Safety and Health Administration (OSHA) EtO standard (29 CFR 1910.1047). For the off-site worker scenario, ATSDR assumed an 8.5-hour workday, 250 days a year, for 25 years (ATSDR, 2016), yielding an exposure factor (EF) of 0.08.

$$EF_{cancer,\ chronic} = \frac{8.5\frac{hr}{d} \times 5\frac{d}{wk} \times 50\frac{wk}{yr} \times 25\ yr}{24\frac{hr}{d} \times 7\frac{d}{wk} \times 52.14\frac{wk}{yr} \times 78\ yr} = 0.08$$

Cancer risk for workers can be calculated by multiplying the long-term air concentration by the IUR, adjusting the duration of exposure as appropriate using the exposure factor calculation, above:

$$Cancer\ risk = IUR \times EPC\ (\mu g/m^3) \times EF$$

For the maximum commercial concentration of 9.1 µg/m³, this risk equation yields a lifetime occupational cancer risk of $2.1 \times 10^{-3}$, or an increased risk of cancer for 2.1 people in a population of 1,000 workers from chronic exposures to Sterigenics emissions:

$$Cancer\ risk_{occupational} = 0.00299 \times 9.1\ \mu g/m^3 \times 0.08 = \mathbf{2.1 \times 10^{-3}}$$

While a more complete database from which to characterize exposure is preferable, we used U.S. EPA's limited data for the Sterigenics investigation and applied the standard ATSDR evaluation process. Note that in both ATSDR calculations, we made a very conservative assumption that a 12-hour sample represents long term exposure. We felt this assumption was warranted because the measured and modeled concentrations demonstrated consistency and provided support that this range of exposure is possible in the area surrounding Sterigenics.

FILED DATE: 9/27/2018 1:26 PM    2018L010510

### Non-cancer effects

Workers exposed to ethylene oxide over a long-term duration experienced similar health effects to those exposed over shorter durations (California EPA, 2008). Workers exposed to levels of EtO at 8,500 μg/m³ and higher over an average of 5-6.5 years demonstrated cognitive and motor impairment compared to unexposed controls. At lower levels of EtO exposure (145-300 μg/m³), studies have shown evidence of hemoglobin adducts, DNA damage effects (i.e. sister chromatid exchanges), and hematological effects (i.e. increases in leukocytes and decreases in neutrophil counts; decreases in hematocrit and hemoglobin) (California EPA, 2008). No measured EtO concentrations from the residential or occupational sampling approached or exceeded effect levels in the long-term modeling estimates or the 12-hour samples being used as chronic exposure surrogates, therefore, non-cancer health effects are not expected. However, air sampling in this effort was extremely limited.

## LIMITATIONS

ATSDR made several assumptions as part of this assessment that could lead to the over or underestimation of risk. Some limitations of this assessment include:

1. To calculate risks, ATSDR assumed that the concentrations measured during this assessment will continue, unchanged if no actions are taken, over 33 years for residents, and 25 years for workers.
2. ATSDR assumed that the very limited sampling investigation of 26 discrete locations over 2 days throughout the community represents typical exposure conditions from Sterigenics EtO emissions. Only one 12-hour residential sample was collected, and that sample was used to represent the RME residential chronic exposure estimate. EtO concentrations from grab samples at one other residential location were slightly higher than the 12-hour averaged sample collected at this property.
3. ATSDR assumed that the highest EtO concentration in the commercial area surrounding Sterigenics represents worst case off-site worker exposures. This is likely underestimating worker exposures for some employees in this area.
4. Due to a lack of long term sampling, the temporal trends of EtO emissions could not be evaluated. Fluctuations of seasons that affect temperatures, barometric pressure, wind speed and direction, and other potential factors that could influence the transport of EtO into the surrounding community were not assessed.

Despite these limitations, ATSDR acknowledges that the U.S. EPA modeling demonstrates similar concentration ranges to community air measurements. Thus, ATSDR believes the exposure estimates assumed in this assessment are reasonable. Historical emissions were higher before a substantial drop in 1999 with the construction of aeration rooms in Building 1. EtO cancer risks may have been substantially greater for the 14 years the facility operated before these emission controls were implemented, but historical risk cannot be evaluated with available emissions data.

FILED DATE: 9/27/2018 1:26 PM   2018L010510

**Conclusions:**

U.S. EPA asked ATSDR to answer the following question: "*If modeled and measured ethylene oxide concentrations represent long term conditions, would they pose a public health problem for people living and working in Willowbrook?*" U.S. EPA provided modeled and measured data for ATSDR to evaluate and render a health opinion.

It is ATSDR's conclusion that the data U.S. EPA provided suggests that residents and workers are exposed to elevated airborne EtO concentrations from facility emissions. It is difficult to assess long-term public health implications from facility emissions because there has been no historical air monitoring in the community. ATSDR assumed that these data represent long term exposures for area residents and workers. Specifically, ATSDR concludes the following:

1) If measured and modeled data represent typical EtO ambient concentrations in ambient air, *an elevated cancer risk exists* for residents and off-site workers in the Willowbrook community surrounding the Sterigenics facility. These elevated risks *present a public health hazard to these populations*.
2) Measured and modeled ethylene oxide concentrations in ambient air indicate that non-cancer health effects are unlikely for residents and off-site workers in the Willowbrook community surrounding the Sterigenics facility.

**Recommendations:**

1) ATSDR recommends that Sterigenics take immediate action to reduce EtO emissions at this facility.
2) ATSDR recommends that U.S. EPA work with the Sterigenics facility to initiate long-term air monitoring as soon as possible to measure ambient air levels of EtO. Ongoing air monitoring can demonstrate the effectiveness of actions taken by the company to reduce emissions and subsequent exposures in the community.
3) ATSDR recommends that IDPH investigate whether there are elevated cancers in the population surrounding the Sterigenics facility that are consistent with those associated with chronic EtO exposures.

Please do not hesitate to contact ATSDR Region 5 to discuss this assessment further or to request further public health assistance.

Sincerely,

Michelle A. Colledge

Michelle Colledge, MPH, PhD
Environmental Health Scientist
Agency for Toxic Substances and Disease Registry
Division of Community Health Investigations
Central Branch, Region 5

FILED DATE: 9/27/2018 1:26 PM    2018L010510

CC:
Ken Runkle, IDPH
Aaron Martin, IDPH
Kathryn Siegel, U.S. EPA
Margaret Sieffert, U.S. EPA
Alexis Cain, U.S. EPA
Mark Johnson, ATSDR/ DCHI/CB
Rick Gillig, ATSDR/ DCHI/CB
Tina Forrester, ATSDR/ DCHI/OD

**References:**

Agency for Toxic Substances and Disease Registry (ATSDR). 2018. Discussion between ATSDR and U.S. EPA Region 5 Air and Radiation Division on 7/23/2018.

Agency for Toxic Substances and Disease Registry (ATSDR). 2016. Exposure Dose Guidance for Determining Life Expectancy and Exposure Factor. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service.

Agency for Toxic Substances and Disease Registry (ATSDR). 1990. Toxicological Profile for Ethylene Oxide. Health and Human Services: Atlanta, GA. Accessed from: https://www.atsdr.cdc.gov/toxprofiles/tp.asp?id=734&tid=133

American Cancer Society (ACS). 2018. Lifetime probability of developing or dying of cancer. Accessed from: https://www.cancer.org/cancer/cancer-basics/lifetime-probability-of-developing-or-dying-from-cancer.html

California Environmental Protection Agency (California EPA). 2008. Determination of Noncancer Chronic Reference Exposure Levels, Appendix D3, Ethylene Oxide. Accessed from: https://oehha.ca.gov/chemicals/ethylene-oxide.

Illinois Environmental Protection Agency (Illinois EPA). 2017. DRAFT/PROPOSED Clean Air Act Permit Program (CAAPP) PERMIT. Permit No. 95120085. Bureau of Air, Permit Section. April 17, 2017.

Illinois Environmental Protection Agency (Illinois EPA). 2015. *Statement of Basis* for the DRAFT CAAPP Permit for: Sterigenics. Statement of Basis No.: 95120085. February 25, 2015.

Jinot, J., Fritz, J., Vulimiri, S., and Keshava, N. 2017. Carcinogenicity of ethylene oxide: key findings and scientific issues. *Toxicol Mech Methods*, Jun;28(5):386-396.

National Research Council (NRC). 2010. Committee on Acute Exposure Guideline Levels. Washington (DC): National Academies Press (US). ISBN: 978-0-309-15944-9.

Steenland, K; Stayner, L; Deddens, J. 2004. Mortality analyses in a cohort of 18 235 ethylene oxide exposed workers: Follow up extended from 1987 to 1998. Occup Environ Med 61: 2-7.

Steenland, K., Whelan, E., Deddens, J., Stayner, L., Ward, E. 2003. Ethylene oxide and breast cancer incidence in a cohort study of 7576 women (United States). *Cancer Causes Control*. 14:531–539.

Sterigenics International, LLC. 2018. Willowbrook, IL: Ethylene Oxide Sterilization. Accessed from: https://www.sterigenics.com/facilities_pdfs/2018/eo/n_amer/Willowbrook.pdf.

United States Census (Census). 2016. American Fact Finder: 2016 Population Estimates. Accessed from http://www.census.gov.

United States Environmental Protection Agency (U.S. EPA). 2018. Validated Raw Data Package. Provided to ATSDR by U.S. EPA Air and Radiation Division (ARD) for review on 6/6/2018.

United States Environmental Protection Agency (U.S. EPA). 2016. Evaluation of the Inhalation Carcinogenicity of Ethylene Oxide. National Center for Environmental Assessment, Washington DC. Accessed from http://www.epa.gov/iris.

FILED DATE: 9/27/2018 1:26 PM    2018L010510

14

740
1990

FILED DATE: 9/27/2018 1:26 PM 2018L010510

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
DUPAGE COUNTY, ILLINOIS
CHANCERY DIVISION

PEOPLE OF THE STATE OF ILLINOIS,           )
*ex rel.* LISA MADIGAN, Attorney           )
General of the State of Illinois,          )
                                           )
        Plaintiff,                         )
                                           )
        v.                                 )        No.  2015 CH 651
                                           )
STERIGENICS U.S., LLC,                     )
a Delaware limited liability company,      )
                                           )
        Defendant.                         )

**CASE CLOSED**

JUDGE'S INIT. _____

**CONSENT ORDER**

Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* LISA MADIGAN, Attorney

General of the State of Illinois, the Illinois Environmental Protection Agency ("Illinois EPA"),

and Defendant, STERIGENICS U.S., LLC, (collectively, "Parties to the Consent Order") have

agreed to the making of this Consent Order and submit it to this Court for approval.

## I.     INTRODUCTION

This stipulation of facts is made and agreed upon for purposes of settlement only and as a

factual basis for the Court's entry of the Consent Order and issuance of any injunctive relief.

None of the facts stipulated herein shall be introduced into evidence in any other proceeding

regarding the violations of the Illinois Environmental Protection Act ("Act"), 415 ILCS 5/1 *et*

*seq.* (2014), and the Illinois Pollution Control Board ("Board") Regulations, alleged in the

Complaint except as otherwise provided herein.  It is the intent of the parties to this Consent

Order that it be a final judgment on the merits of this matter.

1

**EXHIBIT**

**B**

FILED DATE: 9/27/2018 1:26 PM    2018L010510

**A.    Parties**

1.    On April 3, 2015, a Complaint was filed on behalf of the People of the

State of Illinois by Lisa Madigan, Attorney General of the State of Illinois, on her own motion

and upon the request of the Illinois EPA, pursuant to Section 42(d) and (e) of the Act, 415 ILCS

5/42(d) and (e) (2014), against the Defendant.

2.    The Illinois EPA is an administrative agency of the State of Illinois, created

pursuant to Section 4 of the Act, 415 ILCS 5/4 (2014).

3.    At all times relevant to the Complaint, Defendant Sterigenics U.S., LLC was, and

is, a Delaware limited liability company, and operated a  gaseous sterilization business located at

7775 Quincy Street, Willowbrook, DuPage County, Illinois ("Facility" or "Site").

4.    The Defendant's sterilization process uses ethylene oxide, a hazardous air

pollutant, and generates ethylene glycol and other chemicals.

5.    Plaintiff has alleged that, on or about October 7, 2013, the Defendant released

ethylene glycol into soil and groundwater at, and in the vicinity of, the Site.

6.    On October 21, 2013, the Defendant reported the uncontrolled release of 30

pounds of ethylene oxide gas to the atmosphere.  The Defendant subsequently revised its

estimate of the quantity of ethylene oxide released to approximately 12 pounds.

**B.    Allegations of Non-Compliance**

Plaintiff contends that the Defendant has violated the following provisions of the Act and

Board Regulations:

Count I:    WATER POLLUTION, violation of 415 ILCS 5/12(a) (2014);

Count II:    CREATING A WATER POLLUTION HAZARD, violation of 415

Count III:  VIOLATION OF GENERAL USE WATER QUALITY STANDARDS, 415 ILCS 5/9(a) (2014), and 35 Ill. Adm. Code 302.203;

Count IV:  NPDES PERMIT VIOLATION, 415 ILCS 5/12(f) (2014), and 35 Ill. Adm. Code 309.102;

Count V:  AIR POLLUTION, violation of 415 ILCS 5/9(a) (2014) and 35 Ill. Adm. Code 201.141;

Count VI:  VIOLATION OF CAAPP PERMIT CONDITIONS: FAILURE TO COMPLY WITH NESHAP EMISSION STANDARDS, 415 ILCS 5/9.1(d) (2014), 415 ILCS 5/39.5(6) (2014), 40 CFR 63.362(a), and Conditions 7.1.6(c)(1) and 7.1.3(b)(ii) of CAAPP Permit No. 95120085;

Count VII:  VIOLATION OF CAAPP PERMIT CONDITIONS: FAILURE TO COMPLY WITH EMISSION LIMITATIONS FOR THE CHICAGO AREA, 415 ILCS 5/9(a) (2014), 415 ILCS 5/39.5(6) (2014), 35 Ill. Adm. Code 218.986(a), and Condition 7.1.3(d)(i) of CAAPP Permit No. 95120085.

**C.  Non-Admission of Violations**

The Defendant represents that it has entered into this Consent Order for the purpose of settling and compromising disputed claims without having to incur the expense of contested litigation. By entering into this Consent Order and complying with its terms, the Defendant does not affirmatively admit the allegations of violation within the Complaint and referenced above, and this Consent Order shall not be interpreted as including such admission.

**D.  Compliance Activities to Date**

1.  On January 13, 2014, the Defendant applied to enter its Facility into Illinois EPA's voluntary Site Remediation Program ("SRP") to address remediation of the release of ethylene glycol, propylene glycol and sulfate from the Facility. The Facility remediation project

3

FILED DATE: 9/27/2018 1:26 PM 2018L010510

was designated under the SRP as the "Sterigenics US LLC site, LPC No. 0431105032" ("On Site SRP").

2. On November 18, 2014, Illinois EPA issued a No Further Remediation letter ("NFR letter") to the Defendant for the work performed under the On-Site SRP. The Defendant recorded the NFR letter for the On-Site SRP with the office of the DuPage County Recorder on December 5, 2014.

3. On July 13, 2014, the Defendant applied to enter off-site areas which were affected, or potentially affected, by the release of ethylene glycol, propylene glycol, and sulfate into the SRP. The off-site remediation project has been designated by Illinois EPA as the "Willowbrook Centre Joint Venture, LPC No. 0431105077" ("Off-Site SRP").

4. On May 29, 2015, Illinois EPA issued an NFR letter to the Defendant for work performed under the Off-Site SRP. The Defendant recorded the NFR letter for the Off-Site SRP with the office of the DuPage County Recorder on July 6, 2015.

## II.    APPLICABILITY

This Consent Order shall apply to and be binding upon the Parties to the Consent Order. The Defendant waives as a defense to any enforcement action taken pursuant to this Consent Order the failure of any of its officers, directors, agents, employees or successors or assigns to take such action as shall be required to comply with the provisions of this Consent Order. This Consent Order may be used against the Defendant in any subsequent enforcement action or permit proceeding as proof of a past adjudication of violation of the Act and the Board Regulations for all violations alleged in the Complaint in this matter, for purposes of Sections 39 and 42 of the Act, 415 ILCS 5/39 and 42 (2014).

4

## III.   JUDGMENT ORDER

This Court has jurisdiction of the subject matter herein and of the Parties to the Consent Order and, having considered the stipulated facts and being advised in the premises, finds the following relief appropriate:

### IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

**A.   Civil Penalty**

1.   The Defendant shall pay a civil penalty of Fifty Thousand Dollars ($50,000.00). Payment shall be tendered at time of entry of the Consent Order.

2.   The civil penalty payment shall be made by certified check or money order payable to the Illinois EPA for deposit into the Environmental Protection Trust Fund ("EPTF").

3.   The case name and case number shall appear on the face of the certified check or money order.

**B.   Future Compliance**

1.   The Defendant shall comply with the terms and conditions of its Clean Air Act Permit Program ("CAAPP ) Permit.

2.   This Consent Order in no way affects the responsibilities of the Defendant to comply with any other federal, state or local laws or regulations, including but not limited to the Act and the Board Regulations.

3.   The Defendant shall cease and desist from future violations of the Act and Board Regulations that were the subject matter of the Complaint.

**C.   Enforcement and Modification of Consent Order**

1.   This Consent Order is a binding and enforceable order of this Court. This Court shall retain jurisdiction of this matter and shall consider any motion by any party for the purposes

5

FILED DATE: 9/27/2018 1:26 PM    2018L010510

of interpreting and enforcing the terms and conditions of this Consent Order. The Defendant agrees that notice of any subsequent proceeding to enforce this Consent Order may be made by mail and waives any requirement of service of process.

2.      The Parties to the Consent Order may, by mutual written consent, extend any compliance dates or modify the terms of this Consent Order without leave of this Court. A request for any modification shall be made in writing and submitted to the designated representatives. Any such request shall be made by separate document, and shall not be submitted within any other report or submittal required by this Consent Order. Any such agreed modification shall be in writing and signed by authorized representatives of each party, for filing and incorporation by reference into this Consent Order.

**D.      Release from Liability**

In consideration of the Defendant's payment of a $50,000.00 civil penalty and its commitment to cease and desist as contained in Section III.B.2 above, the Plaintiff releases, waives and discharges the Defendant from any further liability or penalties for the violations of the Act and Board Regulations that were the subject matter of the Complaint herein. The release set forth above does not extend to any matters other than those expressly specified in Plaintiff's Complaint filed on April 3, 2015. The Plaintiff reserves, and this Consent Order is without prejudice to, all rights of the State of Illinois against the Defendant with respect to all other matters, including but not limited to the following:

a.      criminal liability;

b.      liability for future violations;

c.      liability for natural resources damage arising out of the alleged violations; and

d.      the Defendant's failure to satisfy the requirements of this Consent Order.

6

Nothing in this Consent Order is intended as a waiver, discharge, release, or covenant not to sue for any claim or cause of action, administrative or judicial, civil or criminal, past or future, in law or in equity, which the State of Illinois may have against any person, as defined by Section 3.315 of the Act, 415 ILCS 5/3.315 (2014), other than the Defendant.

**E.    Execution and Entry of Consent Order**

This Order shall become effective only when executed by all Parties to the Consent Order and the Court. This Order may be executed by the parties in one or more counterparts, all of which taken together shall constitute one and the same instrument. The undersigned representatives for each party certify that they are fully authorized by the party whom they represent to enter into the terms and conditions of this Consent Order and to legally bind them to it.

FILED DATE: 9/27/2018 1:26 PM   2018L010510

WHEREFORE, the parties, by their representatives, enter into this Consent Order and submit it to this Court that it may be approved and entered.

AGREED:

FOR THE PLAINTIFF:

PEOPLE OF THE STATE OF ILLINOIS
*ex rel.* LISA MADIGAN
Attorney General of the
State of Illinois

MATTHEW J. DUNN, Chief
Environmental Enforcement/
Asbestos Litigation Division

BY: _Elizabeth Wallace_
ELIZABETH WALLACE, Chief
Assistant Attorney General
Environmental Bureau

DATE: ___9/14/15___

ILLINOIS ENVIRONMENTAL
PROTECTION AGENCY

LISA BONNETT, Director
Illinois Environmental Protection Agency

BY: _____
JOHN J. KIM
Chief Legal Counsel

DATE: ___9/10/15___

8

FILED DATE: 9/27/2018 1:26 PM   2018L010510

FOR THE DEFENDANT:

STERIGENICS U.S., LLC

BY: ___KAltoboman___

Its: ___SVP - Global EH&S___

DATE: ___08-Sept-2015___


ENTERED:

___Ronne M Neston___
J U D G E

DATE: ___9-18-15___


*People v. Sterigenics U.S. LLC, 15 CH 651*

9